# EXHIBIT 1

## Second Amended Complaint

IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT
IN AND FOR MARION COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO. 2016-CA-000167

A.A.,

      Plaintiff,

vs.

THE BOY SCOUTS OF AMERICA
NORTH FLORIDA COUNCIL,
INC., BOY SCOUTS OF
AMERICA, AND SILVER
SPRINGS SHORES
PRESBYTERIAN CHURCH, INC.,

      Defendants.

_____/

## SECOND AMENDED COMPLAINT FOR DAMAGES

Plaintiff, A.A, by and through his undersigned counsel, files this Complaint against Defendants, THE BOY SCOUTS OF AMERICA, a foreign corporation authorized to do business in Florida (hereinafter referred to as the "BSA"), the NORTH FLORIDA COUNCIL, INC., BOY SCOUTS OF AMERICA, a corporation authorized to do business in Florida (hereinafter referred to as the "NORTH FLORIDA COUNCIL"), and the SILVER SPRINGS SHORES PRESBYTERIAN CHURCH, INC., a corporation authorized to do business in Florida (hereinafter referred to as the "SILVER SPRINGS SHORES") and for good cause, states:

## INTRODUCTION

1.     **General Statement of Claims:**  This Complaint is based on the childhood sexual abuse of Plaintiff, A.A. caused by the negligent, willful, wanton, reckless and tortious acts and omissions of BSA, NORTH FLORIDA COUNCIL, SILVER SPRINGS SHORES, Scoutmaster Steve Fout and other agents of the BSA, and George Fout, formerly an Assistant Scoutmaster.

2.      At all relevant times, George Fout was the agent of Defendant BSA, the NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES.  These claims relate to acts of sexual battery as described in Section 794.011, Florida Statutes suffered by the Plaintiff, A.A., while he was a participant in the programs operated by the Defendants, and each of them.

3.      As more particularly described herein, the Plaintiff suffered the sexual battery described herein as a result of the neglect of the BSA, the NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES and their respective agents to, among other things, exercise due care in the administration, management and operation of its scouting program, their breach of their fiduciary duties and their vicarious liability for the acts of their agents.

4.      **Jurisdiction and Venue**:     This is an action for damages that exceed Fifteen Thousand Dollars ($15,000.00), exclusive of interest, costs and attorneys' fees.

5.      Venue is proper in Marion County, Florida because the events giving rise to this action occurred in Marion County, Florida. .

6.      **The Parties:**    A.A. is currently an adult residing in Marion County, Florida. The initials "A.A." are used to protect the identity of Plaintiff from public disclosure. The identity and further relevant details shall be disclosed to the Defendants off record and confidentially.

7.      At all relevant times, A.A. resided in Marion County, Florida.

8.      A.A. was a member of the Boy Scouts of America Troup 448.

9.      Plaintiff met his abuser, George Fout, due to George Fout's role as the Assistant Scoutmaster of Troup 448.

10.     SILVER SPRINGS SHORES was the chartering organization for Troop 448, or such other Boy Scout Troop as A.A. was a member (herein collectively referred to as "Troop 448").

11.     The BSA is a foreign corporation authorized to do business in the state of Florida.

12.     At all relevant times, BSA controlled or had the right to control the NORTH FLORIDA COUNCIL and the sponsoring organizations, which implemented BSA's scouting program, including, without limitation, SILVER SPRINGS SHORES.

13.     The NORTH FLORIDA COUNCIL is a corporation authorized to do business in the State of Florida and is located in Duval County, Florida.

14.     At all relevant times, the NORTH FLORIDA COUNCIL was an agent of BSA, subject to BSA's control or right to control.

15.     As Defendant BSA's agent, the NORTH FLORIDA COUNCIL controlled or had the right to control local troops directly, or through their sponsoring organizations, including, without limitation, SILVER SPRINGS SHORES.

16.     SILVER SPRINGS SHORES is a corporation authorized to do business in the State of Florida and is located in Marion County, Florida. At all relevant times, SILVER SPRINGS SHORES was an agent of BSA and the COUNCIL, subject to their control or right to control.

17.     As Defendant BSA and NORTH FLORIDA COUNCIL' agent, SILVER SPRINGS SHORES controlled or had the right to control the programs and troops that it sponsored, including its Scoutmaster and Assistant Scoutmasters.

18.     The BSA, NORTH FLORIDA COUNCIL and SILVERS SPRINGS SHORES will be collectively referred to herein as the Boy Scout Defendants.  When so used, the term references each in their respective individual capacities.

19.     Steve Fout was the Scoutmaster and leader of Troop 448.

20.     George Fout was Steve's son and was an Assistant Scoutmaster of Troop 448.

**The BSA**

21.     The BSA is a large youth-serving organization which promotes, markets, and encourages parents to enroll their children in the BSA. Enrollment in the BSA requires parents to entrust their children's health and safety to the BSA and requires children to engage in activities that expose them to adults and others. Much of the BSA's activities include over-night outings, camping trips, and trips away from parents.

**The Hierarchy of the BSA and the BSA's Control Over Its Agent Scouting Organizations**

22.     The BSA has established its presence through the use of a hierarchical system, whereby local Councils and chartering organizations implement and maintain the BSA's program at a local level under the BSA's guidance and control.

23.     Organizationally, the BSA is separately incorporated from local councils, but the BSA and the BSA's local councils comprise a tightly integrated, hierarchal organizational structure under the BSA's control at the top.

24.     The BSA issues the Boy Scouts of America name, emblems, badges, markings, and youth programs to the Councils and chartering organizations. The BSA requires the local

Council and troops within a local Council to strictly adhere to the BSA's organizational charter and standards of leadership.

25.     For example, all members of scout troops chartered through a local council must be registered and pay dues to the BSA. The BSA oversees and controls all professional staffing of local councils. Local councils may not employ any professional scouts who are not drawn from a BSA approved candidate list that the BSA compiled and maintained. Local councils are not permitted to use any programs or materials that the BSA has not supplied or approved.

26.     Unless the BSA has selected and approved them, no adult scout leader, whether paid or volunteer, may serve in a local troop or council.

27.     The BSA asserts First Amendment associational rights to exclude Scoutmasters and volunteers who do not share their values or beliefs and anyone else it chooses from participating in scouting.  Indeed the BSA has *successfully* asserted these associational rights in trial, appellate and over their volunteer and are judicially estopped from asserting that they do not have control or a special relationship with their Scoutmasters and volunteers. *See*, for example, *Boy Scouts of American vs. Dale*, 530 U.S. 640 (2004).  The BSA is similarly judicially estopped from arguing that these Scoutleaders and volunteers are not their agents.

28.     The BSA provides a wide variety of management services to locals councils and troops, including insurance and risk management, marketing, education, training, scout camps, facilities, media relations, and human resources. Duplicate personnel files on local council employees are maintained at the local council and at the BSA's national headquarters.

29.     The BSA creates the bylaws, rules and regulations that every chartering organization must adhere to in implementing and running the BSA's scouting program. Significantly, the BSA's bylaws obligate a chartering organization to provide adequate facilities,

supervision, and leadership for the troop in exchange for the granting of a charter to run a local scouting troop.

30.     A local scouting troop cannot exist without the support of a chartering organization that has received a charter from the BSA authorizing the chartering organization to implement and run the BSA's scouting program.

31.     Under the BSA bylaws, each chartering organization is required to select at least three people over the age of 21 to serve as the Troop Committee. The Troop Committee then selects the Troop Scoutmaster. The BSA must approve scout leaders, whether paid or volunteer, to serve in a local troop or council.

32.     Together, the Troop Committee and the Scoutmaster are responsible for the general program and supervision of the troop.

33.     Further, each chartering organization is required to appoint a representative other than the Scoutmaster or Assistant Scoutmaster to serve as its institutional representative on the local Council.

34.     A chartering organization must reapply to the BSA every year for a renewed charter in order to continue to operate a local troop. The BSA may revoke a chartering organization's charter at any time should the chartering organization be found to deviate from the BSA's charter and bylaws.

35.     This chartering system reveals the BSA's consent to allow local chartering organizations to operate the scouting program on its behalf and the chartering organizations' consent to operate the local troops subject to the BSA's control or right to control.  Accordingly, the chartering organizations, such as SILVER SPRINGS SHORES, are the agents of the BSA.

36.     The BSA uses a similar structure in relation to its local Councils, such as the NORTH FLORIDA COUNCIL. The BSA issues a charter to an approved local Council authorizing the local Council to administer the scouting program to the local scout troops within the region on behalf of the BSA.

37.     The local Councils are subject to the same bylaws, rules and regulations as the chartering organizations. If a local Council deviates from the rules and regulations established by the BSA, then the local Council may have its charter revoked.

38.     All local Councils must apply to the BSA for renewal of their charters annually.

39.     It is the duty of the local Council to promote, support, and maintain the BSA scouting regime amongst all local troops within the local Councils area.

40.     The chartering system shows the BSA's consent to allow local Councils to operate the scouting program on its behalf within a specific geographic region, and the local Councils consent to operate the scouting program subject to the BSA's control or right to control. Thus, the local Councils are agents of the BSA.

41.     The BSA cannot operate its scouting program without the consent and cooperation of the local Councils and chartering organizations.  Conversely, the chartering organizations and local Councils cannot operate and supervise local scouting troops without the consent of the BSA.

42.     At all relevant times, Defendant NORTH FLORIDA COUNCIL and/or Defendant SILVER SPRINGS SHORES were serving as Defendant the BSA's agents by implementing and maintaining the BSA's scouting program on a local level.

## The BSA, NORTH FLORIDA COUNCIL's and
## SILVER SPRINGS SHORES Special Relationship with A.A.

43.     The Boy Scout Defendants have a special relationship with A.A., for reasons which included, without limitation, the following:

      a.     A.A. and his family imposed confidence in The Boy Scout Defendants through A.A.'s participation in Boy Scouts of America Troop 448 that A.A. would, among other things, learn the values and characteristics that Defendants promote through involvement with the BSA, and ultimately would be safe from harm in doing so;

      b.     It is through A.A.'s involvement with The Boy Scout Defendants, and George Fout's relationship with The Boy Scout Defendants that A.A. was abused by George Fout;

      c.     The Boy Scout Defendants had a direct and special relationship with scouts who participated in its programs. A.A. was a child at the time of the abuse. The abuse began and often occurred when A.A. was placed in the care and custody of Defendants The Boy Scout Defendants, with the resulting loss of control to protect himself;

      d.     A.A. was a child at the time of the abuse. He was raped and molested at locations and under circumstances where he was unable to protect himself or was otherwise unable to avail himself of his legal guardian for their ordinary source of protection or were otherwise relying entirely on the Boy Scout Defendants and their agents, including Scoutmaster Steve Fout, for his protection, and

      e.     The Boy Scout Defendants, were substituting for A.A.'s parents during the relevant times.

## BSA, NORTH FLORIDA COUNCIL's and SILVER SPRINGS SHORES Special
## Relationship with, and Constructive Control
## over Scoutmaster Steve Fout, and his Agency for them.

44.     At all relevant times, A.A. was enrolled in the Boy Scouts of America scouting program.

45.     At all relevant times, A.A. was a member of Boy Scouts of America Troop 448 in Ocala, Florida. Troop 448 was chartered by Defendant SILVER SPRINGS SHORES,

46.     Troop 448 was under the jurisdiction of Defendant NORTH FLORIDA COUNCIL.

47.     Each of SILVER SPRINGS SHORES and the NORTH FLORIDA COUNCIL were under the ultimate control and authority of the BSA.

48.     But for the BSA's consent, neither SILVER SPRINGS SHORES, nor the NORTH FLORIDA COUNCIL would have authorization to carry out activities in the name of the BSA, including conducting the activities of Troop 448.

49.     As the chartering organization of Troop 448, Defendant SILVER SPRINGS SHORES was responsible for providing adequate facilities, supervision, and leadership for the troop, subject to the approval of the Council and the BSA and consistent with their direction and policies.

50.     The troop meetings were held in facilities owned or operated by Defendant SILVER SPRINGS SHORES.  Certain activities were held in facilities owned or operated by the Council and the BSA.

51.     At all times material hereto, the Boy Scout Defendants installed Steve Fout as the Scoutmaster (a/k/a Troop Leader) for Troop 448.

52.     As the Scoutmaster of Troop 448, Steve Fout led troop meetings, trained troop members in scout craft and survival skills, helped and encouraged troop members to earn merit badges, planned and led troop activities, coordinated troop fundraising and oversaw the Troop activities.

53.     At all times relevant, Steve Fout was subject to the approval, direction, control and authority of the Boy Scout Defendants.

54.     Steve Fout had the specific authorization from the Boy Scout Defendants to wear the BSA badge and insignia and other indicia and brands of the BSA, to hold himself out as a leader for the BSA and to lead meeting and events on the premises of the BSA and Silver Springs Shores.

55.     In fact, Steve Fout did hold himself out as such, lead meetings and took the scouts, including A.A. on events, including overnight campouts, on the premises of the Boy Scout Defendants.

56.     Steve Fout's activities, and each of them, were specifically sanctioned by the Boy Scout Defendants.  At all times relevant, the Boy Scout Defendants had the control or the ability to control, Steve Fout's display of his the BSA badge and insignia and other indicia and brands of the BSA.

57.     But for the Boy Scout Defendants' consent, neither Steve Fout would have authorization to carry out activities in the name of the BSA, including conducting the activities of Troop 448.

58.     The subject authorization was designed to instill, and did instill, trust and confidence in Steve Fout by the parents, guardians and scouts and further served to promote the BSA brand.

59.     But for Steve Fout's position with the Boy Scout Defendants, A.A. would not have been permitted to spend overnights at his home.  There is a causal connection between Steve Fout's position with the Boy Scout Defendants and A.A.'s abuse.

60.     A.A. and his guardians each perceived Steve Fout to be a representative of the BSA, the Council and Silver Springs Shores and to be a person whom they could entrust with A.A.

61.     At all times relevant hereto, Steve Fout was an Assistant Scoutmaster for Troop 448 and was selected, accepted, ratified, approved and authorized by the Boy Scout Defendants to serve in his capacity for the purpose of educating, instructing and training young boys, including A.A. in morality, patriotism and various life skills.

62.     At all times relevant hereto, Steve Fout served and acted as a duly authorized and ratified agent, employee, servant, representative and/or volunteer of the Boy Scout Defendants, and was subject to the authority, dominion and control of the Boy Scout Defendants.

63.     Steve Fout had actual or apparent authority to act on behalf of the BSA, the Council and Silver Springs Shores, and each of them.

64.     As a result there was, at all relevant times, a special relationship and agency between Steve Fout and Boy Scout Defendants.

### BSA, NORTH FLORIDA COUNCIL's and SILVER SPRINGS SHORES Special Relationship with, and Constructive Control over perpetrator and assistant Scoutmaster, George Fout, and his Agency for them.

65.     At all times material hereto, the Boy Scout Defendants installed George Fout, as an Assistant Scoutmaster (a/k/a Assistant Troop Leader) for Troop 448.  George Fout was Steve Fout's son.

66.     At all times material hereto, Assistant Scoutmaster George Fout was under the direct supervision of Scoutmaster Steve Fout.

67.     As the Assistant Scoutmaster of Troop 448, George Fout assisted Steve Fout in his activities.

68.     As the Assistant Scoutmaster of Troop 448, George Fout led troop meetings, trained troop members in scout craft and survival skills, helped and encouraged troop members

to earn merit badges, planned and led troop activities, coordinated troop fundraising and oversaw the Troop activities.

69.     At all times relevant, George Fout was subject to the approval, direction, control and authority of The Boy Scout Defendants.

70.     George Fout had the specific authorization from the Boy Scout Defendants to wear the BSA badge and insignia and other indicia and brands of the BSA, to hold himself out as a leader for the BSA and to lead meeting and events on the premises of the BSA and Silver Springs Shores.

71.     In fact, George Fout did hold himself out as such, lead meetings and took the scouts, including A.A. on events, including overnight campouts, on the premises of the Boy Scout Defendants.

72.     George Fout's activities, and each of them, were specifically sanctioned by the Boy Scout Defendants.  At all times relevant, Boy Scout Defendants had the control or the ability to control, George Fout's display of his the BSA badge and insignia and other indicia and brands of the BSA.

73.     But for the Boy Scout Defendants consent, George Fout would not have authorization to carry out activities in the name of the BSA, including conducting the activities of Troop 448.

74.     The subject authorization was designed to instill, and did instill, trust and confidence in George Fout by the parents, guardians and scouts and further served to promote the BSA brand.

75.     But for George Fout's position with the Boy Scout Defendants, A.A. would not have been permitted to spend overnights at his home.  There is a causal connection between Steve Fout's position with the Boy Scout Defendants and A.A.'s abuse.

76.     A.A. and his guardians each perceived George Fout to be a representative of the Boy Scout Defendants and to be a person whom they could entrust with A.A.

77.     At all times relevant hereto, Steve Fout was an Assistant Scoutmaster for Troop 448 and was selected, accepted, ratified, approved and authorized by the Boy Scout Defendants to serve in his capacity for the purpose of educating, instructing and training young boys, including A.A. in morality, patriotism and various life skills.

78.     At all times relevant hereto, Steve Fout served and acted as a duly authorized and ratified agent, employee, servant, representative and/or volunteer of the Boy Scout Defendants, and was subject to the authority, dominion and control of the Boy Scout Defendants.

79.     George Fout had actual or apparent authority to act on behalf of the Boy Scout Defendants, and each of them.

80.     As a result there was, at all relevant times, a special relationship and agency between George Fout and The Boy Scout Defendants.

**<u>George Fout's Grooming and Preparation of A.A. and</u>**
**<u>Three (3) Other Scouts from Troop 448 for Abuse.</u>**

81.     Perpetrators of sexual abuse against children often "groom" the victim for the abuse.   This grooming is a process of mental, emotional, psychological and physical manipulation by which the perpetrator prepares a child, significant others, and the environment for the abuse of the child.  Specific goals include gaining access to the child, gaining the child's compliance, and maintaining the child's secrecy to avoid disclosure. This process serves to strengthen the offender's abusive pattern, as it may be used as a means of justifying or denying their actions.

82.     The grooming process consists of a series of stages.  These include the stages of selecting a vulnerable victim, gaining access to the child, developing trust, and desensitizing the victim to touch.

83.     As to the first stage, when selecting a victim, offenders often target children based on family situations, such as those living in single family households as often in these cases children may have less adult supervision or the custodial parent may rely upon others to help with childcare responsibilities.

84.     This pattern of grooming and its specific stages are discernable to supervising adults, including Scoutmasters, particularly if they are properly trained to recognize the behavior. This "grooming" results in its own resulting psychological and emotional abuse and damage, separate from the impending physical sexual abuse.

85.     George Fout engaged in exactly these stages of grooming A.A. prior to and during his abuse of A.A.  George Fout often showered Plaintiff with special attention and otherwise engaged in the grooming process described.

86.     A.A. met the profile of a particularly vulnerable child, as he was being raised by a single non-parent adult with no strong male role model.

87.     At the time that George Fout grooming A.A., he was simultaneously grooming at least three (3) other child scouts in Troop 448 for sexual abuse, for a total of four (4) scouts in a single troop undergoing grooming for impending sexual abuse.

88.     As a result of George Fout's grooming of A.A., it was foreseeable that George Fout would ultimately consummate the grooming in its goal of sexual abuse.

89.     Indeed, ultimately, George Fout's grooming of each of these four (4) scouts did result in them suffering his continuous and ongoing sexual abuse.

90.     This grooming frequently occurred on the premises of SILVER SPRINGS SHORES and during events sponsored by the BSA.

91.     Upon information and belief, Troop 448 Scoutmasters knew or should have known that George Fout was grooming A.A. for abuse and that abuse of A.A. was foreseeable, impending and ongoing.

92.     In addition, it is a reasonable inference that, while George Fout was grooming four (4) scouts under their care, adult supervisors of Troop 448, including Steve Fout, observed actions and behavior by George Fout by which they knew or should have known that George Fout was grooming the scouts, including A.A. for abuse and that abuse of A.A. was foreseeable, impending and ongoing.

93.     Further, if the Boy Scout Defendants had properly trained adult leaders and Scoutmasters to identify grooming behavior, they would have identified George Fout as being actively engaged in grooming four (4) child scouts in their troop and would have been trained to

warn A.A. and his parents of the impending abuse and prevent the abuse and the resulting injuries and damage.

### George Fout's Abuse of A.A. was Foreseeable and Immanent.

94.    George Fout's sexual abuse of A.A. was foreseeable, as the Boy Scout Defendants each had actual and constructive notice of George Fout's grooming of A.A., and actual and constructive notice of the impending and immanent and actual abuse of A.A. and the abuse, in fact, of A.A.

95.    This notice included, without limitation:

a.    That George Fout would engage in a pattern of grooming of A.A. in their presence and on the premises of Silver Springs Shores and at events sanctioned and managed by the BSA and the NORTH FLORIDA COUNCIL;

b.    That George Fout would engage in a pattern of grooming of three (3) other scouts. in their presence and on the premises of Silver Springs Shores and at events sanctioned and managed by the BSA and the NORTH FLORIDA COUNCIL;

c.    Upon information and belief and upon reasonable inference, the adult troop leaders should have known that George Fout engaging in grooming of four (4) minor scouts in their presence and on the premises of Silver Springs Shores and at events sanctioned and managed by the BSA and the NORTH FLORIDA COUNCIL;

d.    On at least one occasion, George Fout touched A.A.'s penis while he was alone in a tent with A.A. at an event on the BSA property which was administrated by the BSA NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES, providing notice to The Boy Scout Defendants of grooming, sexual abuse, and the ongoing process of grooming, including that George Fout's propensity to engage in sexual abuse is foreseeable and immanent;

e.    At times, A.A, would leave scouting events held on Defendants' premises with Scoutmaster Steve Fout and Assistant Scoutmaster George Fout to spend time at the Fout's residence in violation of the BSA policy;

     f.      Adult scout leaders of Troop 448 knew or should have known that A.A. and other scouts of Troop 448 would visit the home of George Fout and would often spend the night in the bedroom of George Fout, in violation of BSA policy;

     g.     Steve Fout, as agent for the BSA, the NORTH FLORIDA COUNSEL and SILVER SPRINGS SHORES was personally present over the course of many years as George Fout, his adult son, took four (4) minor child scouts to his room, each on a series of separate occasions, for hours of "game play" and overnight sleep-overs behind closed doors;

     h.     Steve Fout should have known or was willfully ignorant of the fact that his son was abusing minor children under his roof;

     i.     Steve Fout, as a troop leader and an agent for the BSA, the NORTH FLORIDA COUNSEL and SILVER SPRINGS SHORES knew, should have known or was willfully ignorant that George Fout was actively abusing or posed a threat of sexual abuse to minor scouts under his care.

96.     During all relevant times hereto, George Fout was conducting himself in such a manner and fashion that the Boy Scout Defendants knew or should have known that George Fout had a propensity to commit and engage in sexual misconduct.

97.     If the Boy Scout Defendants had properly and adequately supervised the conduct and the activities of George Fout, they would have known or should have known of the misconduct of George Fout, so as to prevent the sexual abuse and infliction of emotional distress on A.A.

98.     Had the Boy Scout Defendants not acted in such a careless, negligent, and/or reckless manner, they would have known and/or should have known of the conduct of George Fout, as described herein, and of his propensity to engage in such activities, such that the Boy Scout Defendants could and/or should have prevented the sexual abuse and the infliction of physical and emotional distress on A.A.

99.     As agents for the Boy Scout Defendants, actual or constructive knowledge to Steve Fout and to adult troop leaders that George Fout posed a risk to the scouts and had a

propensity to engage in the grooming and sexual abuse is imputed to the BSA, the NORTH FLORIDA COUNSEL, jointly and severally.

**The BSA, the NORTH FLORIDA COUNSEL and SILVER SPRINGS SHORES**
**Had Constructive Control of the Premises upon which**
**George Fout's Behavior Provided Notice of the Impending Abuse.**

100.    On at least one occasion, George Fout touched A.A.'s penis while he was alone in a tent with A.A. at the BSA administrated event on the BSA property.

101.    George Fout's grooming and resulting psychological and emotional damage relating to A.A.'s sexual abuse often occurred on property owned and controlled by the BSA and Silver Shores and during events sanctioned and administrated by the Boy Scout Defendants.

102.    Similarly, on multiple and continuing occasions, notice of George Fout's propensity to commit abuse, including without limitation, his grooming of A.A. and at least four (4) other scouts occurred on property owned and controlled by Boy Scout Defendants and during events sanctioned and administrated by the BSA, the Council and Silver Shores.

**George Fout's Abuse of A.A.**

103.    A.A. was introduced to his abuser, George Fout through his membership in the BSA Troop 448.

104.    At all times material hereto, George Fout was an adult.  At all times material hereto, A.A. was a minor.

105.    At all times relevant hereto, for the purpose of furthering his duties as an Assistant Scoutmaster, George Fout sought and gained the then minor A.A.'s trust, friendship, admiration and obedience. As a result, A.A. was conditioned to comply with George Fout's direction and to look to him as an authority figure.

106.     At all relevant times hereto, using the power, authority and trust of his position as an Assistant Scoutmaster, and availing himself of the Boy Scout Defendants' representations to parents and scouts that tire BSA was a moral and safe place for young boys, George Fout groomed, enticed, induced, directed, coerced and forced A.A. to engage in deviant sexual acts with him.

107.     As the foreseeable extension of the grooming process, George Fout committed a sexual abuse, sexual touching, penetration, oral and anal sodomy and other acts of sexual battery constituting violations of Section 794.011, Florida Statutes, upon A.A.

108.     Eventually, George Fout escalated the frequency of the sexual battery to the point where he was sexually abusing A.A. approximately once a month.

109.     At all times relevant hereto, George Fout utilized physical, emotional and spiritual force and persuasion to impose his moral will upon the then minor A.A. in order to commit grievous, unspeakable acts of sexual abuse upon the person of then minor A.A. all of which acts constitute flagrant abuse of the symbolism, power and authority of his position as an Assistant Scoutmaster.

110.     The grooming and other notice of George Fout's propensity for abuse would frequently occur on the premises of SILVER SPRINGS SHORES and during sanctioned the BSA events on the BSA property.

111.     The sexual battery would often take place at George Fout's home after scouting events, in which he resided with Steve Fout, his father and the Scoutmaster of Troop 448. Steve Fout was often present in the home during George Fout's sexual battery of A.A.

112.    At times, A.A, would leave scouting events held on Defendants' premises with Scoutmaster Steve Fout and Assistant Scoutmaster George Fout to spend time at the Fout's residence in violation of the BSA policy.

113.    As the sexual battery would continue, without limitation, A.A. would spend the night at the home of Scoutmaster Steve Fout.  This is a clear violation of the BSA policy. During those occasions, A.A. would be abused by Assistant Scoutmaster George Fout. Steve Fout was often in the home often when the incidents of sexual battery occurred.

114.    At no time did the BSA, NORTH FLORIDA COUNCIL, or SILVER SPRINGS SHORES take steps to ensure the non-sleepover between volunteer leaders and youth in the BSA's policy was being implemented and followed by their scoutmasters or scout leaders, and at no time did the BSA, NORTH FLORIDA COUNCIL, or SILVER SPRINGS SHORES take steps to ensure that no one-on-one contact between volunteer leaders and youth were being followed according to the BSA's polices.

115.    A.A. was repeatedly abused under circumstances where he was unable to protect himself or was otherwise unable to avail himself of his legal guardians for their ordinary source of protection or was otherwise relying entirely on The Boy Scout Defendants, and its agents for his protection.

**The BSA, the NORTH FLORIDA COUNSEL and SILVER SPRINGS SHORES Had Actual or Constructive Control of the Premises upon which Sexual Abuse and related Grooming was committed.**

116.    On at least one occasion, George Fout touched A.A.'s penis while he was alone in a tent with A.A. at a the BSA administrated event on the BSA property.

117.    George Fout's grooming and resulting psychological and emotional damage relating to A.A.'s sexual abuse often occurred on property owned and controlled by the BSA and

Silver Shores and during events sanctioned and administrated by the BSA, the Council and Silver Shores.

118.    Similarly, on multiple and continuing occasions, notice of George Fout's propensity to commit abuse, including without limitation, his grooming of A.A. and at least three (3) other scouts occurred on property owned and controlled by the BSA and Silver Shores and during events sanctioned and administrated by the BSA, the Council and Silver Shores.

### The BSA's History of Pedophilia

119.    The BSA has known for decades of the high degree of risk that adult Scoutmasters and volunteers may sexually abuse minor scout members.

120.    Since the early 1900s, the BSA has maintained a system of "Ineligible Volunteer Files" to track incidents wherein adult Scoutmasters sexually abused scouts. The Ineligible Volunteer Files contain internal memoranda demonstrating the BSA's awareness of the ongoing pedophilia within the BSA, and demonstrated concerns about pedophiles within the BSA harming their reputation and economic interests.

121.    These Ineligible Volunteer Files demonstrate the BSA's vulnerabilities when it comes to pedophilia within the BSA and includes pedophiles' techniques used to enter scouting, their techniques for grooming victims and more.

122.    In approximately 1972, the BSA implemented a system requiring local Council's scouting executives to complete and send in a form with any available supporting information about known or alleged sexual abuse committed by adult Scoutmasters in the executives' jurisdiction. Upon receipt of this information from the local Council, the BSA created an Ineligible Volunteer File for the abuser and added it to the BSA's database.

123.    By 1977, the BSA was advising all sponsoring organizations to maintain "two deep leadership" for all scouting activities, wherein two adult Scoutmasters were required to be present at all times. Ostensibly, this precaution was implemented to help prevent sexual abuse in scouting.

124.    Despite the BSA's extensive and long-standing knowledge of the high degree of risk of pedophilia in scouting, the BSA did not implement a sexual abuse-prevention education program until approximately 1988. This program, the Youth Protection Program, was the BSA's first effort to educate scouts and their family members about the risk of sexual abuse in scouting, a risk that continues today.

125.    The BSA has overwhelming evidence that scouting has particular characteristics that make the organization vulnerable to pedophiles, including but limited to:

   a.    Joining the BSA provides pedophiles access to boys alone and away from their families in secluded settings like camp-outs and overnight hikes;

   b.    The BSA repeatedly encourages young boys to strictly obey their scout leaders and masters, allowing pedophiles to groom their victims;

   c.    The BSA encourages overnight stays, camping trips and other activities for scouts and scout leaders and masters to be alone together;

   d.    Scouting provides opportunities for a pedophile to seduce a boy by getting him in situations where the boy has to change clothing or spend the night with him;

   e.    A pedophile scout leader can, depending on the pedophile's preferred victim age, volunteer for and be sure to have access only to boys of a certain age;

   f.    The BSA conditions boys to the concept of strict obedience to the scout leader and a bonding mechanism that pedophiles crave;

   g.    The BSA promotes the idea of secret ceremonies, rituals, and loyalty oaths, all of which help facilitate a pedophile's efforts to keep his victims silent and compliant;

h.      The BSA conducted no criminal background checks on its volunteers;

i.      The BSA did not prohibit adults from sleeping in tents with boys overnight;

j.      The BSA did not prohibit adult leaders from spending time alone with individual scouts; i. The BSA did not prohibit adult scout leaders from having contact with scouts outside of authorized scouting activities;

k.      For decades, the BSA re-admitted pedophiles it had previously removed for child abuse after a period of the BSA "probation," thereby exposing unsuspecting children to sexual abuse;

l.      The BSA had a practice of not reporting scout abuse incidents to law enforcement;

m.      The BSA had a pattern of reaching an accommodation with a pedophile, in which the pedophile would resign from scouting and the BSA would agree not to report the child sexual abuse to civil authorities;

n.      The BSA refused requests to share its list of known abusers with other youth organizations, knowing that pedophiles it had ejected often joined other youth-serving organizations;

o.      The BSA refused to produce its I.V. files to its review board and scout safety consultants, who were endeavoring to develop and implement meaningful safeguards and barriers to pedophile infiltration;

p.      The BSA refused to fingerprint, photograph or perform background checks on its adult volunteers, allowing removed pedophiles using an alias to sneak back in to scouting through another troop;

q.      The BSA refused to utilize widely accepted organizational best practices that would establish reasonable barriers to intrusion by pedophiles;

r.      The BSA refused to educate local councils, staff, and troop leaders regarding the true risks posed by pedophiles to scouts; and

s.      The BSA refused to effectively monitor local councils and troops to ensure that appropriate safeguards were being used in the selection and retention of adult scout leaders.

126.    The BSA's internal records, known as the "Ineligible Volunteer" files (hereinafter "the I.V. files"), are a unique repository of documents the BSA secretly began amassing shortly after the BSA's founding in 1910.

127.    The I.V. files reveal that the BSA, far from being safe and wholesome, has long attracted and been a sanctuary for pedophiles.

128.    The I.V. files contain internal memoranda demonstrating the BSA's awareness and concern about the threat that pedophiles in the BSA posed to its name, reputation, and economic interests, but little concern for the danger pedophiles presented to scouts and others in the community.

129.    The IV Files contain internal memoranda demonstrating BSA's awareness and concern about the threat that pedophiles in BSA posed to its name, reputation, and economic interests, but little concern for the danger pedophiles presented to scouts and others in the community. See Exhibit "A" (The Ernst Memorandum evidencing the BSA and the local council's ongoing conspiracy to suppress from the public its certain knowledge of its pedophile infiltration problem), BSA's I.V. files are a hidden repository of informative data containing the identities of pedophiles that have successfully infiltrated scouting. The I.V. files highlight BSA's vulnerabilities, including pedophiles' techniques used to enter scouting, pedophiles' patterns for grooming victims, and widely-found biographical and behavioral characteristics shared by pedophiles that had entered or were attempting to enter scouting.

130.    The BSA's I.V. files are a hidden repository of informative data containing the identities of pedophiles that had successfully infiltrated scouting. The I.V. files highlight the BSA's vulnerabilities, including pedophiles' techniques used to enter scouting, pedophiles

patterns for grooming victims, and widely-found biographical and behavioral characteristics shared by pedophiles that had entered or were attempting to enter scouting.

131.    The overwhelming evidence the I.V. files present shows that for a century the BSA has known of the BSA's distinctive characteristics that render scouts particularly prone to pedophiles' abuse.

132.    By 1935, the BSA had accumulated approximately 2,000 files on pedophiles that had successfully infiltrated or attempted to infiltrate its program.

133.    In the 1970s, the BSA recognized the potential liabilities represented by possessing and maintaining the I.V. files. By 2005, the BSA's secret cache of files on pedophiles exceeded 20,000.

134.    Over the course of two years in the early 1970s, three the BSA executives reviewed and permanently destroyed thousands of I.V. files

135.    The BSA executives kept no retention logs showing which or how many of the files the BSA destroyed. The BSA made no contemporaneous record of its criteria in determining which files to destroy and which to save.

136.    Approximately 6,000 files survived the BSA's file-purge and are in the BSA's possession. Approximately 1900 of those files are now in the public domain.

137.    The files demonstrate that the BSA opened a new I.V. file on a pedophile every other day for fifty years.

138.    The I.V. files demonstrate that the BSA had overwhelming evidence (1) that scouting attracts pedophiles at an alarming rate and (2) of scouting's distinctive characteristics that make it attractive to pedophiles:

139.    Between 1987 and 2005, the BSA settled sixty-one lawsuits in which the BSA was allegedly negligent in failing to warn or protect scouts from sexually abusive adult scout leaders. Since 1987, the BSA has paid millions of dollars in settlements and verdicts arising from sexual abuse of scouts by scout leaders. Upon information and belief, many of these settlements included confidentiality agreements required by the BSA to prevent the abuse's facts and circumstances from becoming public.

140.    As between the Boy Scout Defendants and A.A., the Boy Scout Defendants had superior knowledge of the risk of sexual abuse to A.A. by participating in the BSA program, yet failed to warn or otherwise advise A.A. or his guardians of their superior knowledge.

### Negligence of The Boy Scout Defendants – Failure of Policy and Training.

141.    BSA and its agents knew from long experience based on information contained in its Ineligible Volunteer Files that pedophiles had for nearly a century been exploiting vulnerabilities within it organization to gain access to and sexually abuse boys.

142.    BSA and its agents had certain knowledge that pedophiles like George Fout could exploit BSA's vulnerabilities. BSA knew that failure to adopt and implement certain policies and practices to protect scouts would cause scouts, including A.A, to be at heightened risk of pedophilic grooming and sexual abuse.

143.    The BSA's failure to adopt and effectively implement policies and practices to protect scouts in its custody and control included, without limitation:

144.    Permitting fathers to act as Scoutmasters, in a supervisory position over their adult sons, as Assistant Scoutmasters, effectively eliminating certain protections afforded by a two-deep policy;

145.    Failing to educate scouts and other adult scout leaders about the grooming behaviors they knew that pedophile scout leaders engaged so that that scouts could recognize, resist, and report the inappropriate behaviors;

146.    Failing to monitor or evaluate scout staff to prevent them from using its program and facilities to gain access, groom, and sexually abuse scouts;

147.    Further, to the extent that the BSA undertook to adopt any such policies, they were insufficient for the foreseeable risk presented and were not properly implemented or enforced.

### Negligence of The Boy Scout Defendants – Failure to Protect A.A. from foreseeable abuse by George Fout.

148.    The Boy Scout Defendants, each having a special relationship with A.A. and over Steve Fout and George Fout.

149.    The actual or constructive knowledge that The Boy Scout Defendants and Steve Fout possessed of George Fout's grooming of A.A. and other scouts in Troop 448 rendered the abuse of A.A. not only foreseeable, but highly likely.

150.    In addition, the access that George Fout had to vulnerable children like A.A., the potential to take advantage of the special relationship with potential victims and the failures of BSA policy which George Fout used to gain access to, groom, and to sexually abuse A.A., were precisely the same foreseeable vulnerabilities that BSA had documented in tens of thousands of ineligible volunteer files it had been keeping for nearly a century.

## ACTIONS AGAINST SILVER SPRINGS SHORES

### Count I: Negligence of Defendant SILVER SPRINGS SHORES

151.     Plaintiff incorporates Paragraphs 1 through 150 above as fully set forth under this count and further alleges as follows:

152.     Defendant, SILVER SPRINGS SHORES undertook to promote and provide a scouting program for children and minor boys.

153.     Having undertaken this activity, SILVER SPRINGS SHORES had duty to act with reasonable care and to take precautions so that persons may not be injured.

154.     In addition, Defendant SILVER SPRINGS SHORES had a special relationship with A.A., as more particularly alleged in Paragraphs 43 (a) - (e) above.

155.     This special relationship between Defendant SILVER SPRINGS SHORES and A.A. gave rise to a right of protection for A.A.

156.     Based on the special protective relationship with A.A., Defendant SILVER SPRINGS SHORES had a duty to protect A.A. from reasonably foreseeable harm.

157.     In addition, Defendant, SILVER SPRINGS SHORES had a special relationship with George Fout as more particularly described in Paragraphs 65 - 80 which gives SILVER SPRINGS SHORES a duty to control the actions of George Fout.

158.     George Fout engaged in a process of grooming of A.A. and three other scouts under the care of SILVER SPRINGS SHORES.  Grooming is a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93

159.     The grooming which George Fout inflicted upon A.A. is both an injury in and of itself and is notice to SILVER SPRINGS SHORES that sexual abuse is not only foreseeable, but likely.

160.     SILVER SPRINGS SHORES and its agents has actual or constructive notice of the behavior of George Fout, as more particularly described in Paragraphs 94 - 99, such that the sexual abuse of A.A was not only foreseeable, but likely.

161.     George Fout's grooming and notice of grooming and other behavior giving rise to the described notice occurred on the premises actually or constructively controlled by SILVER SPRINGS SHORES.

162.     In addition, on at least one occasion, George Fout touched A.A.'s penis while he was alone in a tent with A.A. at an event on BSA property which was administrated by the BSA NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES.

163.     Defendant SILVER SPRINGS SHORES breached the duty it owed A.A., by acts or omissions which included, without limitation:

a.     Failing to protect A.A. from reasonably foreseeable harm, including, without limitation, the reasonably foreseeable harm that A.A. would be sexually abused by George Fout, and other negligence more particularly described in Paragraphs 103 - 115.

b.     Allowing George Fout to have unsupervised contact with A.A. during Troop 448 scouting activities and spend time at the home of Steve Fout and George Fout, which allowed George Fout to isolate and sexually abuse A.A.

c.     Failing to otherwise oversee the appointment of Scoutmasters and Assistant Scoutmasters, otherwise properly oversee the activities of Troop 448, its scouts, Scoutmasters and Assistant Scoutmasters and otherwise conduct the activities of the Troop pursuant to the required and due standards of care.

     d.     Failing to advise or warn A.A. or his guardian of the history of pedophilia in the BSA and to affirmatively educate A.A. and guardian to identify and avoid abuse.

     e.     Failing to implement proper training and policies to identify and prevent the sexual abuse of scouts as more particularly alleged in Paragraphs 141 - 147.

164.    As a direct and proximate cause of Defendant SILVER SPRINGS SHORES' negligent acts and omissions, A.A. was the victim of acts of sexual battery, including acts constituting violations of Section 794.011, Florida Statutes.

165.    Further, as a direct and proximate cause of Defendant SILVER SPRINGS SHORES' negligent acts and omissions, A.A. was the victim of a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93.

166.    As a result of the grooming of George Fout and as a result of the related sexual battery perpetrated on A.A. by George Fout, A.A. has suffered and continues to suffer permanent, progressive and disabling emotional, psychological and physiological damages and bodily injuries, and he continues to experience mental anguish, humiliation, and emotional and physical distress, all in an amount to be proven at trial.

WHEREFORE, the Plaintiff, A.A., seeks judgment against Defendant SILVER SPRINGS SHORES for A.A.'s compensatory damages, plus costs of suit, post-judgment interest, and such other and further relief as this Court deems just and proper. A.A. reserves the right to amend this Complaint to assert punitive damages. A.A. further requests trial by jury of all issues so triable.

**Count II: Breach of Fiduciary Duty of Defendant SILVER SPRINGS SHORES**

167.    Plaintiff incorporates Paragraphs 1 through 150 above as fully set forth under this count and further alleges as follows:

168.    As a result of the relationship described in Paragraphs 43 (a) - (e) above, A.A. and SILVER SPRINGS SHORES, and as a result of the moral, social, personal and legal relations and obligations arising therefrom, A.A. reposed in SILVER SPRINGS SHORES and SILVERS SPRINGS SHORES accepted the trust and confidence of A.A.

169.    As a result, SILVER SPRINGS SHORES owed A.A. a fiduciary duty, including, without limitation, a duty to protect A.A. from foreseeable harm.

170.    In addition, Defendant, SILVER SPRINGS SHORES had a special relationship with George Fout as more particularly described in Paragraphs 65 - 80 which gives SILVER SPRINGS SHORES a duty to control the actions of George Fout.

171.    George Fout engaged in a process of grooming of A.A. and three other scouts under the care of SILVER SPRINGS SHORES.  Grooming is a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93

172.    The grooming which George Fout inflicted upon A.A. is both an injury in and of itself and is notice to SILVER SPRINGS SHORES that sexual abuse is not only foreseeable, but likely.

173.    SILVER SPRINGS SHORES and its agents has actual or constructive notice of the behavior of George Fout, as more particularly described in Paragraphs 94 - 99, such that the sexual abuse of A.A was not only foreseeable, but likely.

174.     George Fout's grooming and notice of grooming and other behavior giving rise to the described notice occurred on the premises actually or constructively controlled by SILVER SPRINGS SHORES.

175.     In addition, on at least one occasion, George Fout touched A.A.'s penis while he was alone in a tent with A.A. at an event on BSA property which was administrated by the BSA NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES.

176.     Defendant SILVER SPRINGS SHORES breached the fiduciary duty it owed A.A., by acts or omissions which included, without limitation:

    a.    Failing to protect A.A. from reasonably foreseeable harm, including, without limitation, the reasonably foreseeable harm that A.A. would be sexually abused by George Fout, and other negligence more particularly described in Paragraphs 103 - 115.

    b.    Allowing George Fout to have unsupervised contact with A.A. during Troop 448 scouting activities and spend time at the home of Steve Fout and George Fout, which allowed George Fout to isolate and sexually abuse A.A.

    c.    Failing to otherwise oversee the appointment of Scoutmasters and Assistant Scoutmasters, otherwise properly oversee the activities of Troop 448, its scouts, Scoutmasters and Assistant Scoutmasters and otherwise conduct the activities of the Troop pursuant to the required and due standards of care.

    d.    Failing to implement proper training and policies to identify and prevent the sexual abuse of scouts as more particularly alleged in Paragraphs 141 - 147.

177.     As a direct and proximate cause of Defendant SILVER SPRINGS SHORES' breach of its fiduciary duty, A.A. was the victim of acts of sexual battery, including acts constituting violations of Section 794.011, Florida Statutes.

178.     Further, as a direct and proximate cause of Defendant SILVER SPRINGS SHORES' breach of its fiduciary duty, A.A. was the victim of a process of mental, emotional,

psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93.

179.    As a result of the grooming of George Fout and as a result of the related sexual battery perpetrated on A.A. by George Fout, A.A. has suffered and continues to suffer permanent, progressive and disabling emotional, psychological and physiological damages and bodily injuries, and he continues to experience mental anguish, humiliation, and emotional and physical distress, all in an amount to be proven at trial.

WHEREFORE, the Plaintiff, A.A., seeks judgment against Defendant SILVER SPRINGS SHORES for A.A.'s compensatory damages, plus costs of suit, post-judgment interest, and such other and further relief as this Court deems just and proper. A.A. reserves the right to amend this Complaint to assert punitive damages. A.A. further requests trial by jury of all issues so triable.

## ACTIONS AGAINST NORTH FLORIDA COUNCIL

### Count III: Negligence of Defendant NORTH FLORIDA COUNCIL

180.    Plaintiff incorporates Paragraphs 1 through 150 above as fully set forth under this count and further alleges as follows:

181.    Defendant, NORTH FLORIDA COUNCIL undertook to promote and provide a scouting program for children and minor boys

182.    Having undertaken this activity, NORTH FLORIDA COUNCIL had duty to act with reasonable care and to take precautions so that persons may not be injured.

183.    In addition, Defendant NORTH FLORIDA COUNCIL had a special relationship with A.A., as more particularly alleged in Paragraphs 43 (a) - (e) above.

184.     This special relationship between Defendant NORTH FLORIDA COUNCIL and A.A. gave rise to a right of protection for A.A.

185.     Based on the special protective relationship with A.A., Defendant NORTH FLORIDA COUNCIL had a duty to protect A.A. from reasonably foreseeable harm.

186.     In addition, Defendant, NORTH FLORIDA COUNCIL had a special relationship with George Fout as more particularly described in Paragraphs 65 - 80 which gives NORTH FLORIDA COUNCIL a duty to control the actions of George Fout.

187.     George Fout engaged in a process of grooming of A.A. and three other scouts under the care of NORTH FLORIDA COUNCIL.  Grooming is a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93

188.     The grooming which George Fout inflicted upon A.A. is both an injury in and of itself and is notice to NORTH FLORIDA COUNCIL that sexual abuse is not only foreseeable, but likely.

189.     NORTH FLORIDA COUNCIL and its agents has actual or constructive notice of the behavior of George Fout, as more particularly described in Paragraphs 94 - 99, such that the sexual abuse of A.A was not only foreseeable, but likely.

190.     George Fout's grooming and notice of grooming and other behavior giving rise to the described notice occurred on the premises actually or constructively controlled by NORTH FLORIDA COUNCIL.

191.     In addition, on at least one occasion, George Fout touched A.A.'s penis while he was alone in a tent with A.A. at an event on BSA property which was administrated by The Boy Scout Defendants.

192.     Defendant, NORTH FLORIDA COUNCIL breached the duty it owed A.A., by

acts or omissions which included, without limitation:

a.     Failing to protect A.A. from reasonably foreseeable harm, including, without limitation, the reasonably foreseeable harm that A.A. would be sexually abused by George Fout, and other negligence more particularly described in Paragraphs 103 - 115.

b.     Allowing George Fout to have unsupervised contact with A.A. during Troop 448 scouting activities and spend time at the home of Steve Fout and George Fout, which allowed George Fout to isolate and sexually abuse A.A.

c.     Failing to otherwise oversee the appointment of Scoutmasters and Assistant Scoutmasters, otherwise properly oversee the activities of Troop 448, its scouts, Scoutmasters and Assistant Scoutmasters and otherwise conduct the activities of the Troop pursuant to the required and due standards of care.

d.     Failing to implement proper training and policies to identify and prevent the sexual abuse of scouts as more particularly alleged in Paragraphs 141 - 147.

193.     As a direct and proximate cause of Defendant, NORTH FLORIDA COUNCIL's

negligent acts and omissions, A.A. was the victim of acts of sexual battery, including acts

constituting violations of Section 794.011, Florida Statutes.

194.     Further, as a direct and proximate cause of Defendant NORTH FLORIDA

COUNCIL' negligent acts and omissions, A.A. was the victim of a process of mental, emotional,

psychological and physical manipulation generally described as grooming and more particularly

described in Paragraphs 81 - 93.

195.     As a result of the grooming of George Fout and as a result of the related sexual

battery perpetrated on A.A. by George Fout, A.A. has suffered and continues to suffer

permanent, progressive and disabling emotional, psychological and physiological damages and

bodily injuries, and he continues to experience mental anguish, humiliation, and emotional and physical distress, all in an amount to be proven at trial.

WHEREFORE, the Plaintiff, A.A., seeks judgment against Defendant NORTH FLORIDA COUNCIL for A.A.'s compensatory damages, plus costs of suit, post-judgment interest, and such other and further relief as this Court deems just and proper. A.A. reserves the right to amend this Complaint to assert punitive damages. A.A. further requests trial by jury of all issues so triable.

### Count IV: Breach of Fiduciary Duty of Defendant NORTH FLORIDA COUNCIL

196.    Plaintiff incorporates Paragraphs 1 through 150 above as fully set forth under this count and further alleges as follows:

197.    As a result of the relationship described in Paragraphs 43 (a) - (e) above, A.A. and NORTH FLORIDA COUNCIL, and as a result of the moral, social, personal and legal relations and obligations arising therefrom, A.A. reposed in NORTH FLORIDA COUNCIL and SILVERS SPRINGS SHORES accepted the trust and confidence of A.A.

198.    As a result, NORTH FLORIDA COUNCIL owed A.A. a fiduciary duty, including, without limitation, a duty to protect A.A. from foreseeable harm.

199.    In addition, Defendant, NORTH FLORIDA COUNCIL had a special relationship with George Fout as more particularly described in Paragraphs 65 - 80 which gives NORTH FLORIDA COUNCIL a duty to control the actions of George Fout.

200.    George Fout engaged in a process of grooming of A.A. and three other scouts under the care of NORTH FLORIDA COUNCIL.  Grooming is a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93

201.     The grooming which George Fout inflicted upon A.A. is both an injury in and of itself and is notice to NORTH FLORIDA COUNCIL that sexual abuse is not only foreseeable, but likely.

202.     NORTH FLORIDA COUNCIL and its agents has actual or constructive notice of the behavior of George Fout, as more particularly described in Paragraphs 94 - 99, such that the sexual abuse of A.A was not only foreseeable, but likely.

203.     George Fout's grooming and notice of grooming and other behavior giving rise to the described notice occurred on the premises actually or constructively controlled by NORTH FLORIDA COUNCIL.

204.     In addition, on at least one occasion, George Fout touched A.A.'s penis while he was alone in a tent with A.A. at an event on BSA property which was administrated by the BSA NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES.

205.     Defendant NORTH FLORIDA COUNCIL breached the fiduciary duty it owed A.A., by acts or omissions which included, without limitation:

     a.     Failing to protect A.A. from reasonably foreseeable harm, including, without limitation, the reasonably foreseeable harm that A.A. would be sexually abused by George Fout, and other negligence more particularly described in Paragraphs 103 - 115.

     b.     Allowing George Fout to have unsupervised contact with A.A. during Troop 448 scouting activities and spend time at the home of Steve Fout and George Fout, which allowed George Fout to isolate and sexually abuse A.A.

     c.     Failing to otherwise oversee the appointment of Scoutmasters and Assistant Scoutmasters, otherwise properly oversee the activities of Troop 448, its scouts, Scoutmasters and Assistant Scoutmasters and otherwise conduct the activities of the Troop pursuant to the required and due standards of care.

d.      Failing to implement proper training and policies to identify and prevent the sexual abuse of scouts as more particularly alleged in Paragraphs 141 - 147.

206.    As a direct and proximate cause of Defendant NORTH FLORIDA COUNCIL' breach of its fiduciary duty, A.A. was the victim of acts of sexual battery, including acts constituting violations of Section 794.011, Florida Statutes.

207.    Further, as a direct and proximate cause of Defendant NORTH FLORIDA COUNCIL' breach of its fiduciary duty, A.A. was the victim of a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93.

208.    As a result of the grooming of George Fout and as a result of the related sexual battery perpetrated on A.A. by George Fout, A.A. has suffered and continues to suffer permanent, progressive and disabling emotional, psychological and physiological damages and bodily injuries, and he continues to experience mental anguish, humiliation, and emotional and physical distress, all in an amount to be proven at trial.

WHEREFORE, the Plaintiff, A.A., seeks judgment against Defendant NORTH FLORIDA COUNCIL for A.A.'s compensatory damages, plus costs of suit, post-judgment interest, and such other and further relief as this Court deems just and proper. A.A. reserves the right to amend this Complaint to assert punitive damages. A.A. further requests trial by jury of all issues so triable.

## ACTIONS AGAINST BSA

## Count V: Negligence of Defendant BSA

209.    Plaintiff incorporates Paragraphs 1 through 150 above as fully set forth under this count and further alleges as follows:

210.     Defendant, BSA undertook to promote and provide a scouting program for children and minor boys.

211.     Having undertaken this activity, BSA had duty to act with reasonable care and to take precautions so that persons may not be injured.

212.     Defendant BSA had a special relationship with A.A., as more particularly alleged in Paragraphs 43 (a) - (e) above.

213.     This special relationship between Defendant BSA and A.A. gave rise to a right of protection for A.A.

214.     Based on the special protective relationship with A.A., Defendant BSA had a duty to protect A.A. from reasonably foreseeable harm.

215.     In addition, Defendant, BSA had a special relationship with George Fout as more particularly described in Paragraphs 65 - 80 which gives BSA a duty to control the actions of George Fout.

216.     George Fout engaged in a process of grooming of A.A. and three other scouts under the care of BSA.  Grooming is a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93

217.     The grooming which George Fout inflicted upon A.A. is both an injury in and of itself and is notice to BSA that sexual abuse is not only foreseeable, but likely.

218.     BSA and its agents has actual or constructive notice of the behavior of George Fout, as more particularly described in Paragraphs 94 - 99, such that the sexual abuse of A.A was not only foreseeable, but likely.

219.     George Fout's grooming and notice of grooming and other behavior giving rise to the described notice occurred on the premises actually or constructively controlled by BSA.

220.     In addition, on at least one occasion, George Fout touched A.A.'s penis while he was alone in a tent with A.A. at an event on BSA property which was administrated by the BSA NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES.

221.     Defendant BSA breached the duty it owed A.A., by acts or omissions which included, without limitation:

   a.     Failing to protect A.A. from reasonably foreseeable harm, including, without limitation, the reasonably foreseeable harm that A.A. would be sexually abused by George Fout, and other negligence more particularly described in Paragraphs 103 - 115.

   b.     Allowing George Fout to have unsupervised contact with A.A. during Troop 448 scouting activities and spend time at the home of Steve Fout and George Fout, which allowed George Fout to isolate and sexually abuse A.A.

   c.     Failing to otherwise oversee the appointment of Scoutmasters and Assistant Scoutmasters, otherwise properly oversee the activities of Troop 448, its scouts, Scoutmasters and Assistant Scoutmasters and otherwise conduct the activities of the Troop pursuant to the required and due standards of care.

   d.     Failing to implement proper training and policies to identify and prevent the sexual abuse of scouts as more particularly alleged in Paragraphs 141 - 147.

222.     As a direct and proximate cause of Defendant BSA' negligent acts and omissions, A.A. was the victim of acts of sexual battery, including acts constituting violations of Section 794.011, Florida Statutes.

223.     Further, as a direct and proximate cause of Defendant BSA' negligent acts and omissions, A.A. was the victim of a process of mental, emotional, psychological and physical

manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93.

224.    As a result of the grooming of George Fout and as a result of the related sexual battery perpetrated on A.A. by George Fout, A.A. has suffered and continues to suffer permanent, progressive and disabling emotional, psychological and physiological damages and bodily injuries, and he continues to experience mental anguish, humiliation, and emotional and physical distress, all in an amount to be proven at trial.

WHEREFORE, the Plaintiff, A.A., seeks judgment against Defendant BSA for A.A.'s compensatory damages, plus costs of suit, post-judgment interest, and such other and further relief as this Court deems just and proper. A.A. reserves the right to amend this Complaint to assert punitive damages. A.A. further requests trial by jury of all issues so triable.

### Count VI: Breach of Fiduciary Duty of Defendant BSA

225.    Plaintiff incorporates Paragraphs 1 through 150 above as fully set forth under this count and further alleges as follows:

226.    As a result of the relationship described in Paragraphs 43 (a) - (e) above, A.A. and BSA, and as a result of the moral, social, personal and legal relations and obligations arising therefrom, A.A. reposed in BSA and SILVERS SPRINGS SHORES accepted the trust and confidence of A.A.

227.    As a result, BSA owed A.A. a fiduciary duty, including, without limitation, a duty to protect A.A. from foreseeable harm.

228.    In addition, Defendant, BSA had a special relationship with George Fout as more particularly described in Paragraphs 65 - 80 which gives BSA a duty to control the actions of George Fout.

229.     George Fout engaged in a process of grooming of A.A. and three other scouts under the care of BSA.  Grooming is a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93

230.     The grooming which George Fout inflicted upon A.A. is both an injury in and of itself and is notice to BSA that sexual abuse is not only foreseeable, but likely.

231.     BSA and its agents has actual or constructive notice of the behavior of George Fout, as more particularly described in Paragraphs 94 - 99, such that the sexual abuse of A.A was not only foreseeable, but likely.

232.     George Fout's grooming and notice of grooming and other behavior giving rise to the described notice occurred on the premises actually or constructively controlled by BSA.

233.     In addition, on at least one occasion, George Fout touched A.A.'s penis while he was alone in a tent with A.A. at an event on BSA property which was administrated by the BSA NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES.

234.     Defendant BSA breached the fiduciary duty it owed A.A., by acts or omissions which included, without limitation:

 a.     Failing to protect A.A. from reasonably foreseeable harm, including, without limitation, the reasonably foreseeable harm that A.A. would be sexually abused by George Fout, and other negligence more particularly described in Paragraphs 103 - 115.

 b.     Allowing George Fout to have unsupervised contact with A.A. during Troop 448 scouting activities and spend time at the home of Steve Fout and George Fout, which allowed George Fout to isolate and sexually abuse A.A.

 c.     Failing to otherwise oversee the appointment of Scoutmasters and Assistant Scoutmasters, otherwise properly oversee the activities of Troop 448, its scouts, Scoutmasters and Assistant Scoutmasters and otherwise

conduct the activities of the Troop pursuant to the required and due standards of care.

d.   Failing to implement proper training and policies to identify and prevent the sexual abuse of scouts as more particularly alleged in Paragraphs 141 - 147.

235.   As a direct and proximate cause of Defendant BSA' breach of its fiduciary duty, A.A. was the victim of acts of sexual battery, including acts constituting violations of Section 794.011, Florida Statutes.

236.   Further, as a direct and proximate cause of Defendant BSA' breach of its fiduciary duty, A.A. was the victim of a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93.

237.   As a result of the grooming of George Fout and as a result of the related sexual battery perpetrated on A.A. by George Fout, A.A. has suffered and continues to suffer permanent, progressive and disabling emotional, psychological and physiological damages and bodily injuries, and he continues to experience mental anguish, humiliation, and emotional and physical distress, all in an amount to be proven at trial.

WHEREFORE, the Plaintiff, A.A., seeks judgment against Defendant BSA for A.A.'s compensatory damages, plus costs of suit, post-judgment interest, and such other and further relief as this Court deems just and proper. A.A. reserves the right to amend this Complaint to assert punitive damages. A.A. further requests trial by jury of all issues so triable.

## VICARIOUS LIABILITY COUNTS

### Count VII: Vicarious Liability of Defendants SILVER SPRINGS SHORES, NORTH FLORIDA COUNCIL and BSA for the Sexual Battery by George Fout

238.    Plaintiff incorporates Paragraphs 1 through 150 above as fully set forth under this count and further alleges as follows:

239.    At all relevant times, George Fout, as Assistant Scoutmaster, was acting as agent for the Boy Scout Defendants by implementing and maintaining a scouting program at the local level with the consent and oversight of Defendant BSA.

240.    Accordingly, the Boy Scout Defendants are vicariously liable for the acts and omissions and breaches of fiduciary duties of George Fout.

241.    George Fout's acts and omissions and breaches of fiduciary duties include, without limitation, committing acts of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93 and performing sexual battery upon A.A.

242.    As a result of acts, A.A. suffered at the time of the abuse and continuing up to the present day permanent, progressive and disabling emotional, psychological and physiological damages and bodily injuries, and he continues to experience mental anguish, humiliation, and emotional and physical distress, all in an amount to be proven at trial, for which such damages, the Boy Scout Defendants are vicariously liable.

WHEREFORE, the Plaintiff, A.A., seeks judgment against Defendants SILVER SPRINGS SHORES, NORTH FLORIDA COUNCIL and BSA for A.A.'s compensatory damages, plus costs of suit, post-judgment interest, and such other and further relief as this Court

deems just and proper. A.A. reserves the right to amend this Complaint to assert punitive

damages. A.A. further requests trial by jury of all issues so triable.

**Count VIII: Vicarious Liability of Defendants SILVER SPRINGS SHORES,
NORTH FLORIDA COUNCIL and BSA
for the Negligence and Breach of Fiduciary Duty of Steve Fout**

243.     Plaintiff incorporates Paragraphs 1 through 150 above as fully set forth under

this count and further alleges as follows:

244.     At all relevant times, Steve Fout, as Scoutmaster, was acting as agent for

Defendants the Boy Scout Defendants by implementing and maintaining a scouting program at

the local level with the consent and oversight of Defendant BSA.

245.     Accordingly, Boy Scout Defendants are vicariously liable for the acts and

omissions and breaches of fiduciary duties of Steve Fout.

246.     Steve Fout's acts and omissions and breaches of fiduciary duties include, without

limitation,

    a)     Failing to protect A.A. from reasonably foreseeable harm, including,
           without limitation, the reasonably foreseeable harm that A.A. would be
           sexually abused by George Fout, and other negligence more particularly
           described in Paragraphs 103 - 115.

    b)     Allowing George Fout to have unsupervised contact with A.A. during
           Troop 448 scouting activities and spend time at the home of Steve Fout
           and George Fout, which allowed George Fout to isolate and sexually
           abuse A.A.

    c)     Failing to otherwise oversee the appointment of Scoutmasters and
           Assistant Scoutmasters, otherwise properly oversee the activities of
           Troop 448, its scouts, Scoutmasters and Assistant Scoutmasters and
           otherwise conduct the activities of the Troop pursuant to the required and
           due standards of care.

    d)     Failing to implement proper training and policies to identify and prevent
           the sexual abuse of scouts as more particularly alleged in Paragraphs 141
           - 147.

e)       Facilitating contact between George Fout and A.A., such that sexual abuse and other acts could be perpetrated upon A.A.

247.     As a direct and proximate cause of Steve Fout's negligent acts and omissions and breach of fiduciary duty, A.A. was the victim of acts of sexual battery, including acts constituting violations of Section 794.011, Florida Statutes.

248.     Further, as a direct and proximate cause of Defendant Steve Fout's negligent acts and omissions and breach of fiduciary duty, A.A. was the victim of a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93.

249.     As a result of the grooming of George Fout and as a result of the related sexual battery perpetrated on A.A. by George Fout, A.A. has suffered and continues to suffer permanent, progressive and disabling emotional, psychological and physiological damages and bodily injuries, and he continues to experience mental anguish, humiliation, and emotional and physical distress, all in an amount to be proven at trial.

WHEREFORE, the Plaintiff, A.A., seeks judgment against Defendant SILVER SPRINGS SHORES for A.A.'s compensatory damages, plus costs of suit, post-judgment interest, and such other and further relief as this Court deems just and proper. A.A. reserves the right to amend this Complaint to assert punitive damages. A.A. further requests trial by jury of all issues so triable.

## Count IX: Vicarious Liability of Defendants NORTH FLORIDA COUNCIL and BSA for the Negligence and Breach of Fiduciary Duty of SILVER SPRINGS SHORES

250.     Plaintiff incorporates Paragraphs 1 through 150 above as fully set forth under this count and further alleges as follows:

251.    At all relevant times, SILVER SPRINGS SHORES was acting as agent for Defendants NORTH FLORIDA COUNCIL and BSA by implementing and maintaining a scouting program at the local level with the consent and oversight of Defendant BSA.

252.    Accordingly, Defendants NORTH FLORIDA COUNCIL and BSA are vicariously liable for the acts and omissions and breaches of fiduciary duties of SILVER SPRINGS SHORES.

253.    SILVER SPRINGS SHORES acts and omissions and breaches of fiduciary duties include, without limitation,

f)      Failing to protect A.A. from reasonably foreseeable harm, including, without limitation, the reasonably foreseeable harm that A.A. would be sexually abused by George Fout, and other negligence more particularly described in Paragraphs 103 - 115.

g)      Allowing George Fout to have unsupervised contact with A.A. during Troop 448 scouting activities and spend time at the home of Steve Fout and George Fout, which allowed George Fout to isolate and sexually abuse A.A.

h)      Failing to otherwise oversee the appointment of Scoutmasters and Assistant Scoutmasters, otherwise properly oversee the activities of Troop 448, its scouts, Scoutmasters and Assistant Scoutmasters and otherwise conduct the activities of the Troop pursuant to the required and due standards of care.

i)      Failing to implement proper training and policies to identify and prevent the sexual abuse of scouts as more particularly alleged in Paragraphs 141 - 147.

j)      Facilitating contact between George Fout and A.A., such that sexual abuse and other acts could be perpetrated upon A.A.

254.    As a direct and proximate cause of SILVER SPRINGS SHORES' negligent acts and omissions and breach of fiduciary duty, A.A. was the victim of acts of sexual battery, including acts constituting violations of Section 794.011, Florida Statutes.

255.    Further, as a direct and proximate cause of SILVER SPRINGS SHORES' negligent acts and omissions and breach of fiduciary duty, A.A. was the victim of a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93.

256.    As a result of the grooming of George Fout and as a result of the related sexual battery perpetrated on A.A. by George Fout, A.A. has suffered and continues to suffer permanent, progressive and disabling emotional, psychological and physiological damages and bodily injuries, and he continues to experience mental anguish, humiliation, and emotional and physical distress, all in an amount to be proven at trial.

WHEREFORE, the Plaintiff, A.A., seeks judgment against Defendants NORTH FLORIDA COUNCIL and BSA for A.A.'s compensatory damages, plus costs of suit, post-judgment interest, and such other and further relief as this Court deems just and proper. A.A. reserves the right to amend this Complaint to assert punitive damages. A.A. further requests trial by jury of all issues so triable.

## Count X: Vicarious Liability of Defendant BSA for the Negligence and Breach of Fiduciary Duty of NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES

257.    Plaintiff incorporates Paragraphs 1 through 150 above as fully set forth under this count and further alleges as follows:

258.    At all relevant times, NORTH FLORIDA COUNCIL was acting as agent for Defendant BSA by implementing and maintaining a scouting program at the local level with the consent and oversight of Defendant BSA.

259.    In addition, at all relevant times, SILVER SPRINGS SHORES was acting as agent for Defendant BSA by implementing and maintaining a scouting program at the local level with the consent and oversight of Defendant BSA.

260.     Accordingly, Defendant BSA is vicariously liable for the acts and omissions and breaches of fiduciary duties of NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES.

261.     NORTH FLORIDA COUNSEL's and SILVER SPRINGS SHORES acts and omissions and breaches of fiduciary duties include, without limitation,

     k)    Failing to protect A.A. from reasonably foreseeable harm, including, without limitation, the reasonably foreseeable harm that A.A. would be sexually abused by George Fout, and other negligence more particularly described in Paragraphs 103 - 115.

     l)    Allowing George Fout to have unsupervised contact with A.A. during Troop 448 scouting activities and spend time at the home of Steve Fout and George Fout, which allowed George Fout to isolate and sexually abuse A.A.

     m)    Failing to otherwise oversee the appointment of Scoutmasters and Assistant Scoutmasters, otherwise properly oversee the activities of Troop 448, its scouts, Scoutmasters and Assistant Scoutmasters and otherwise conduct the activities of the Troop pursuant to the required and due standards of care.

     n)    Failing to implement proper training and policies to identify and prevent the sexual abuse of scouts as more particularly alleged in Paragraphs 141 - 147.

     o)    Facilitating contact between George Fout and A.A., such that sexual abuse and other acts could be perpetrated upon A.A.

262.     As a direct and proximate cause of NORTH FLORIDA COUNSEL's and SILVER SPRINGS SHORES' negligent acts and omissions and breach of fiduciary duty, A.A. was the victim of acts of sexual battery, including acts constituting violations of Section 794.011, Florida Statutes.

263.     Further, as a direct and proximate cause of NORTH FLORIDA COUNSEL's and SILVER SPRINGS SHORES negligent acts and omissions and breach of fiduciary duty,

A.A. was the victim of a process of mental, emotional, psychological and physical manipulation generally described as grooming and more particularly described in Paragraphs 81 - 93.

264.     As a result of the grooming of George Fout and as a result of the related sexual battery perpetrated on A.A. by George Fout, A.A. has suffered and continues to suffer permanent, progressive and disabling emotional, psychological and physiological damages and bodily injuries, and he continues to experience mental anguish, humiliation, and emotional and physical distress, all in an amount to be proven at trial.

WHEREFORE, the Plaintiff, A.A., seeks judgment against Defendant BSA for A.A.'s compensatory damages, plus costs of suit, post-judgment interest, and such other and further relief as this Court deems just and proper. A.A. reserves the right to amend this Complaint to assert punitive damages. A.A. further requests trial by jury of all issues so triable.

## Count XI Fraud, Misrepresentation and Fraudulent Concealment

265.     Plaintiff incorporates Paragraphs 1 through 150 above as fully set forth under this count and further alleges as follows:

266.     Congress founded BSA in the United States in 1910.

267.     Throughout its history, the BSA has consistently held itself out to the public as a "moral and safe" environment for boys to participate in healthy outdoor activities and to be given proper guidance and instruction. Millions of parents and scouts have placed then- trust in the BSA.

268.     Since 1910, hundreds of millions of parents have entrusted their sons to BSA's care, guidance and instruction. Since its inception, BSA aggressively marketed the wholesomeness and safety of its programs to the American Public.

269.   The BSA engages in affirmative commercial efforts which sophisticatedly use powerful American symbols and modern advertising techniques to sell a national belief that the BSA could best mold the proper expression of American boyhood.

270.   The BSA promotes itself as a vehicle for boys to be instructed in good citizenship patriotism, and efficient social organization. Its brand consistently promotes an image of providing a safe environment in which they can develop "patriotism, self-reliance and kindred virtues."  For example, a copy of "BSA Mission" is attached as Exhibit "B".

271.   Paradoxically, the BSA promotes the wholesomeness of its program while knowing that since the 1940s, it has been secretly removing Scoutmasters for child sexual abuse at an alarming rate, which in the 1970s reached an average of one every three days. Its own records demonstrate that it has long known that scouting attracts pedophiles in large numbers and that scouts, far from being safe, are at the heightened risk of sexual abuse by child molesters

272.   The BSA fraudulently concealed from Congress, scouts, their parents and the American taxpayer BSA's certain knowledge that pedophiles had been infiltrating BSA in large numbers for many years, as more particularly described in Paragraphs 119 - 140

273.   The BSA, pursuant to its Congressional Charter in 1916, later codified by 36 U.S.C. Chapter 309 is required to file an annual report to Congress.

274.   The BSA fraudulently concealed the said information from A.A and his guardian. BSA also misrepresented to scouts, their parents and the American taxpayer that the scouts were safe in scouting programs when, in fact, scouts were at an unreasonably heightened risk of sexual abuse by adult scout leaders, BSA made said misrepresentations to A.A and his guardian.

275.    BSA's internal records known as the "Ineligible Volunteer" files (hereinafter referred to as "The IV Files") are a unique repository of documents BSA secretly began amassing shortly after its founding in 1910.

276.    Between 1987 and 2005, BSA settled sixty-one lawsuits in which BSA was allegedly negligent in failing to warn or protect scouts from sexually abusive adult scout leaders.

277.    Since 1987, BSA has paid millions of dollars in settlements and verdicts arising from sexual abuse of scouts by scout leaders. Upon information and belief, many of these settlements included confidentiality agreements required by BSA to prevent the facts and circumstances of the abuse from becoming public.

278.    BSA continues to make false and misleading public statements regarding the risks of sexual abuse in scouting; continues to minimize and downplay the harm of sexual abuse to children in scouting; fails to reach out to provide support and assistance to boys it knows were sexually abused by adult scout leaders; and continues to deny the truth about its historical knowledge of the nature and extent of sexual abuse of scouts by adult scout leaders.

279.    BSA failed to establish reasonable safeguards to prevent pedophiles from entering its programs.

280.    A.A. and his guardians trusted the BSA and reasonably relied upon the BSA's representations that it presented a moral and safe place for boys.

281.    BSA deliberately withheld information from Congress in its annual report from scouts and their parents, including A.A and his guardian.

282.    It withheld information about the true nature and extent of pedophilia in scouting; the warning signs of abuse in scouting, of which BSA was aware; and the methods pedophiles had been using to gain access to scouts, to groom them for abuse, and to keep them silent. BSA's

timely communication of this information would have enabled scouts, including A.A., to protect himself from sexual abuse by pedophiles in scouting. It would have enabled Congress to perform its constitutional oversight function over a congressionally-chartered, tax-payer funded and tax-exempt youth organization which brings unscreened, unvetted adults into contact with tens of millions of children annually.

283.    BSA had a financial incentive to withhold facts and information about predatory and pedophilic Scoutmasters and/or Assistant Scoutmasters.

284.    Since 1910, BSA has derived millions of dollars per year licensing the rights to its name, emblems, scouting paraphernalia, and BSA-branded merchandise to affiliated scouting organizations throughout the United States and abroad (See 36 U.S.C, § 30905). BSA has realized income from these federally-protected assets by marketing them to parents and their children, including A.A.

285.    BSA's marketing includes encouraging parents to enroll their children in BSA. Enrollment secures parents' and children's commitment to follow a system that encourages parents to entrust their children's health and safety to BSA. This entrustment empowers BSA to secure each child's oath to uphold the "Scout Law," to adopt the "Scout" identity, and to adhere to a system that requires children to engage in activities that expose them to adults and others. This system includes overnight outings, camping events, and trips away from parents. The system is reward based, obligating the child to purchase emblems, badges, and other Scouting paraphernalia, which in turn creates profit for the federally charted organization.

286.    In addition to being federally created, federally chartered, and endowed by Congress with exclusive economic rights, BSA is funded by the federal government, private donations, membership dues, corporate sponsors, and special events

287.    BSA is the 18th largest nonprofit in the United States, with income exceeding $780 million dollars a year.

288.    Upon information and belief, the Boy Scout Defendants engaged in a plan of action to cover up incidents of the sexual abuse of minors by Scoutmasters and Assistant Scoutmasters and prevent disclosure, prosecution and civil litigation including, but not limited to:

      a.    Failure to report incidents of abuse to law enforcement or child protection agencies;

      b.    Concealment of abuse they had substantiated and failure to seek out and redress the injuries its Scoutmasters and leaders had caused; and

      c.    Failure to advise local scouting agencies of the rampant problem of sexual abuse of scouts by Scoutmasters and leaders and that BSA's system of "Ineligible Volunteer Files" was ineffective at curbing the problem.

289.    Based on these actions, the Boy Scout Defendants engaged in fraudulent concealment and are estopped from asserting the defense of statute of limitations and/or laches.

290.    A.A. alleges that had the BSA notified A.A., his guardian, civil authorities, or the scouting public of the pervasiveness of sexual abuse by the BSA's adult scout leaders, A.A. would either not have joined the BSA or not been allowed by his guardian to join the BSA.

291.    Alternately, if the BSA had educated A.A. and his guardian of the nature of risks of abuse by adult scout leaders, that he would have taken steps to protect himself from the grooming and sexual abuse to which his adult scout leader subjected him.

292.    BSA had notified or educated A.A. and his guardian of the nature of risks of abuse by adult scout leaders, he would not have, and would not have been permitted continuous sleep-overs at the home of Steve Fout in the bedroom of George Fout.

293.    The above described conduct of the Boy Scout Defendants was willful and outrageous, was committed in reckless disregard of the probability of causing A.A.'s severe emotional distress, mental anguish, humiliation, and psychological, spiritual, and physical injury and illness of A.A.

294.    Additionally, in doing the acts as described herein, the Boy Scout Defendants were guilty of fraud, oppression, or malice.  As a direct and proximate result of the practice of deceit, deception, concealment and fraud by the Boy Scout Defendants and George Fout, A.A. was victimized by George Fout and sustained the profound injuries, losses and damages as set forth therein

WHEREFORE, the Plaintiff, A.A., seeks judgment against Defendant BSA, NORTH FLORIDA COUNCIL and SILVER SPRINGS SHORES for A.A.'s compensatory damages, plus costs of suit, post-judgment interest, and such other and further relief as this Court deems just and proper. A.A. reserves the right to amend this Complaint to assert punitive damages. A.A. further requests trial by jury of all issues so triable.

Dated: August 30, 2019.

**MORGAN & MORGAN, P.A.**
**Business Trial Group**

*s/Paul L. SanGiovanni*
**Paul L. SanGiovanni, Attorney at Law**
Florida Bar No. 0513164
**Cari Whitmire, Attorney at Law**
Florida Bar Number 1015584
20 North Orange Avenue, Suite 1600
Orlando, Florida 32801
Telephone:  (407)418-6041
Facsimile:  (407)245-3394
Primary E-mail:  PSangi@forthepeople.com
Primary E-mail:  CWhitmire@forthepeople.com
Secondary E-mail: MTodd@forthepeople.com

1972



**BOY SCOUTS OF AMERICA**

*North Brunswick • New Jersey 08902 • 201 249-6000*

INTRAORGANIZATION COMMUNICATION

December 4, 1972

PERSONAL AND CONFIDENTIAL

TO ALL SCOUT EXECUTIVES:

SUBJECT:  Maintaining Standards of Leadership

The attached information on Maintaining the Standards of Leadership of the Boy Scouts of America has been carefully developed as a guideline for Scout Executives.

This is the first time such information has been printed, and because of the misunderstandings which could develop if it were widely distributed, we suggest that after you have read it, you file it with other policy statements without making photocopies or sharing it beyond the top management of your council.

If you have any questions, please do not hesitate to write or call us.

Sincerely,

Paul Ernst

Paul I. Ernst, Executive
Registration and Subscription

cm
cc:  Regional Directors
     Management Staff
Attachment

BSA 02205

**Exhibit "A" to Second Amended Complaint**

e ID: 190800135

## MAINTAINING STANDARDS OF LEADERSHIP

Since its inception, the BSA has maintained its right to set standards of leadership in the areas of age, citizenship, sex, education, morals and emotional stability.  This position is set forth in the Bylaws:

> Article II, Section 2, Clause 3 "No person shall be approved as a leader unless, in the judgment of Boy Scouts of America, he possesses the moral, educational, and emotional qualities deemed necessary for leadership and satisfies such other leadership qualifications as it may from time to time require."

> Other supporting Articles are listed in Appendix A.

The local council and the National Council must approve all applications (Bylaws Article XVIII, Section I, Clause 3).

These standards were developed solely to protect the youth of America and their enforcement in no way infringes on the rights of any individuals, nor is refusal of registration to be construed as persecution or defamation of character.  All leaders register for a limited term (usually one year) and reregistration at the end of that period is also subject to approval (Bylaws, Article XV, Section 4).

When a registered leader commits an act or conducts himself in a manner that would seem to cause him to be unfit as a leader or an associate of boys, the Scout Executive should take the following steps:

1) Inform the Registration and Subscription Executive at the National Office of the general nature of the allegations.

2) Secure hard evidence about the situation (signed statements by principals, police reports, court records, newspaper clippings, etc.).

3) Submit evidence and the confidential record sheet to Registration and Subscription.

4) Upon notification from Registration, write a letter to the individual (Appendix B) and <u>hand deliver</u> it along with a volunteer.

5) After the letter has been read, verbally tell the person the reasons for refusal to register.  Make <u>no</u> accusations -- say we have evidence to convince us that your --(financial affairs)  (moral life) (lack of leadership ability) do not meet the standards for leadership in the BSA.  Indicate that the BSA is not sharing this information with anyone and only wish him to stop all Scouting activity.

After this visit, write down the main parts of the conversation, who was present and the date, and mail this to Registration and Subscription.

BSA 02206

-2-

6) If the individual persists, the following review steps are to be taken as required:

A) Initial Step  --  The president of the local council will appoint three volunteers to act as a committee to review the case.

B) (If Step A does not resolve matter)  --  The Regional President will appoint a review committee if the person is not satisfied with the council's decision.

C) (If Step B does not resolve matter)  --  The President of the BSA will appoint a review committee if the individual is not satisfied with the Region's decision.

When a Scout Executive receives a confidential inquiry from Registration and Subscription about a person attempting to register, he should take the following steps:

1) Secure as rapidly as possible the necessary answers on the questionnaire and return to Registration and Subscription.

2) If it is not the same person, the registration certificate will be sent to the council.

3) If it is the same person, Registration and Subscription will write to the Scout Executive, indicating that the BSA is unwilling to register that person because information we have indicates that he fails to meet our standards of leadership. If the individual questions the statement the Scout Executive may ask him if he has ever been in Scouting in the past and been refused membership.

If the answer is yes, the Scout Executive may say the reasons remain the same.

If the answer is no, and the individual insists there has been a mistake, the Scout Executive should instruct him to send a complete statement covering his adult years, including address and dates lived there, occupations and dates, and names of spouse and children to the Registration and Subscription Executive.

In certain cases, an individual who failed to meet the standards of leadership in the past wishes to register and the circumstances are changed sufficiently that the BSA is willing to accept the registration on a trial basis. The Scout Executive will be notified in this situation, and requested to keep a close watch on the individual for one year and then give a brief report to Registration and Subscription.

All cases are reviewed periodically in reference to the seriousness of the offense and the passage of time, and when the standards of leadership seem to be satisfactorily met, cases are cancelled.

BSA 02207

-3-

Many times an individual comes to a council seeking registration with the BSA and something unusual causes concern that further checking should be done before registration is completed.

When you find yourself in this situation, we ask that you write or phone directly to Registration and Subscription, asking that we check for any information that might be on file concerning the individual in question. This will immediately help you in your relationships with the individual and give you information as to whether registration should be completed before you do a lot of unnecessary work and make any commitments which could prove embarrassing.

dw-11/15/72

BSA 02208

Case ID: 190800135

-4-

Appendix A

Article III, Section 2, Clause 1
Article X, Section 5, Clause 1
Article XII, Section 2
Article XII, Section 3
Article XII, Section 4
Article XV, Section 2, Clause 2, 3, 4, 6, 7
Article XVI, Section 6, Clause 4
Article XVIII, Section 2, Clause 1
Article XVIII, Section 3, Clause 2
Article XVIII, Section 4, Clause 1 - 7
Article XVIII, Section 5, Clause 1 - 2
Article XVIII, Section 7, Clause 1 - 2
Article XVIII, Section 9, 10, 11, 12

dw-11/27/72

BSA 02209

Case ID: 190800135

-5-

Appendix - B

Dear

After a review of your past history with the Boy Scouts, it has been
decided not to accept your registration.  Registration with the Boy
Scouts of America is not automatically granted to everyone.  It is a
privilege and we reserve the right to refuse registration whenever
there is any reason for concern related to the person's association
with members or leaders of the Boy Scouts of America.

We, therefore, at this time desire to have you sever your relationship
with the Boy Scouts of America.  We are making no accusations and will
not release this information to anyone, so our action in no way will
affect your standing in the community.

Very truly yours,

Scout Executive

dw

BSA 02210

Case ID: 190800135

# The BSA Mission

## MISSION STATEMENT AND PURPOSE

*The mission of the Boy Scouts of America is to prepare young people to make ethical and moral choices over their lifetimes by instilling in them the values of the Scout Oath and Law.*

## SCOUT OATH

*On my honor I will do my best to do my duty to God and my country and to obey the Scout Law; to help other people at all times; to keep myself physically strong, mentally awake, and morally straight.*

## SCOUT LAW

*A Scout is*

- Trustworthy
- Loyal
- Helpful
- Friendly
- Courteous
- Kind
- Obedient
- Cheerful
- Thrifty
- Brave
- Clean
- Reverent

## Purpose of the BSA

The purpose of this corporation shall be to promote, through organization, and cooperation with other agencies, the ability of boys to do things for themselves and others, to train them in Scoutcraft, and to teach them patriotism, courage, self-reliance, and kindred virtues, using the methods which are now in common use by Boy Scouts.

—Federal Charter, sec. 3.

One of the goals of the Boy Scouts of America is to provide, through chartered organizations, a program for boys, young men, and young women designed to encourage them to be faithful in their religious duties, build desirable qualities of character, train and involve them in the responsibilities of participating citizenship, and develop in them personal fitness.

*Exhibit "B to Second Amended Complaint*

Special emphasis will be placed in assisting the home, religious groups, and schools in achieving success in the development of abiding values in the lives of young people.

All programs will be directed toward helping to develop the full potential of each member.

## The Council's Purpose

The purpose of the council is to guide and support its districts for the achievement of the movement's purpose. (A successful district meets Quality District requirements.) The end result of effective district support is continued growth in membership, with those members receiving a quality program.

## The Function of the Districts

All districts are responsible for carrying out functions in four areas:

1. Membership
2. Finance
3. Program
4. Camp promotion
5. Training
6. Activities and civic service
7. Advancement and recognition
8. Unit service (commissioner service)

The order in which the functions are listed is not meant to suggest the order of their importance, but the natural interrelationship and flow of the functions. The movement cannot achieve its purpose without first organizing units and enrolling members. The district cannot support its units without the funds to do it. Unit programs are supported by the district through its program functions and unit service. All four functions are equally important and necessary. If one suffers from lack of attention, all the work of the district suffers.

The functions of the district include

- Extending opportunities for youth to join a pack, troop, team, or crew
- Helping existing units provide a quality program for their youth
- Marshaling the resources of the territory in terms of volunteers and money

Its specific duties are selling the use of Scouting and providing the essential services. The district committee sells the use of the program to community organizations and helps to organize new units. It provides those things essential to successful Scouting that the chartered organization cannot easily provide, including

- Guidance in the selection of unit leadership
- Training for unit personnel in the techniques of good program
- Interunit activities that stimulate good unit program through participation and competition
- Promotion of the BSA camping and outdoor program
- Promotion of the BSA advancement program by providing merit badge counselors and coaching unit committees on advancement procedures
- Giving guidance to units through effective commissioner service

The district serves as a vehicle by which Scouting services and programs are carried to the chartered organization and units. It serves as a sounding board for chartered organization and unit needs and thus enables the consideration of those needs as the council program is planned. It also participates in determining the council budget and fund-raising for the financing of its program.